CREMEANS, a Minor, et al., Appellees and Cross–Appellants,

v.

**FAIRLAND LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, Appellant and Cross–Appellee.**

[Cite as *Cremeans v. Fairland·Local School Dist. Bd. of Edn.* (1993), 91 Ohio App.3d 548.]

Court of Appeals of Ohio,
Lawrence County.

Nos. 92CA25 and 92CA37.

Decided Nov. 9, 1993.

670

672

*Michael J. Mooney,* for appellees and cross-appellants.

*Rendigs, Fry, Kiely & Dennis* and *John W. Hust,* for appellant and cross-appellee.

HARSHA, Presiding Judge.

Fairland Local School District Board of Education ("Fairland") appeals from the judgment of the Lawrence County Court of Common Pleas which found the individualized education programs ("IEPs") for Allan Cremeans failed to provide him with an appropriate education and ordered a full-time residential program. Fairland also appeals from the court's award of attorney fees to Allan Cremeans and his parents, Darrell and Judy Cremeans. The Cremeanses cross-appeal from the judgment which denied them reimbursement for educational service expenses and their request for compensatory education.

Fairland assigns the following errors:

"I. The trial court erred in failing to give due deference to the decision of the state level review officer by ordering Fairland to provide plaintiff-appellee with

an IEP consisting of a 24–hour–a–day, seven-day-a-week, 12–month residential program.

"II. The trial court erred in failing to consider or give weight to evidence regarding the extraordinary cost of the program it ordered Fairland to provide to plaintiffs."

The Cremeanses assign the following errors:

"I. The lower court erred to the prejudice of the parents by denying them reimbursement for the educational cost they have incurred in attempting to fill the educational void caused by the school's refusal to provide more than one hour a day of home instruction for Allan.

"II. The lower court erred to the prejudice of the parents by failing to award Allan Cremeans compensatory educational services for the three years he has been inappropriately educated."

Allan Cremeans was born on December 29, 1976. He is an autistic child who also may be moderately to severely mentally retarded. Allan began attending multi-handicapped classes in the Fairland Local School District in 1983. Beginning in the 1986–1987 school year and continuing through January 1990, Allan displayed increasingly inappropriate and aggressive behavior at Fairland, including breaking a staff member's nose, urinating on himself and splashing it on others in the classroom, and biting and stabbing his teacher. Some of Allan's inappropriate school behavior was sexually oriented and some was self-abusive, *i.e.*, banging his head against the wall. On January 30, 1990, Allan was removed from Fairland and placed on permanent suspension. Fairland then placed Allan on home instruction beginning February 5, 1990, which consisted of a teacher and an aide providing him one hour of education each day, five days per week, in the Cremeanses' home.

Shortly after Allan's expulsion from Fairland, his parents obtained an evaluation of optional educational programming for Allan from Vicki Jahns, a special educator employed by the Children's Hospital Medical Center in Cincinnati, Ohio. Jahns worked with both the Cincinnati Center for Developmental Disorders ("CCDD") and the Adolescent Developmental Disabilities Program ("ADDP"). In her April 12, 1990 evaluation, Jahns recommended a twenty-four-hour-a-day behavior management program:

"Because the underpinnings of a program for Alan [*sic*] require absolute consistency, it is felt that at this time, it would be appropriate for a professional, skilled in the techniques of behavior management to oversee Alan's [*sic*] 24 hour program. The behavior specialist would set clear realistic goals, modify goals as progress is made, and act as a coach to both home and school to provide them

with observation and then suggestions as to how to modify the commands as they work with Alan [*sic* ].

"Previous behavioral management programs provided clear direction and could be used with success. The essential element must include training time, using direct teaching, guided practice, observation, and gradual self-responsibility for the 24 hour team that will provide Alan [*sic* ] consistent care."

In September 1990, the Cremeanses and Fairland had a meeting to discuss Fairland's proposed IEP for Allan for the 1990–1991 school year. The Cremeanses objected to Fairland's proposed continuation of its home instruction program because the proposal failed to adopt CCDD's recommendation of a twenty-four-hour-a-day behavioral management program. The Cremeanses requested a due process hearing before an impartial hearing officer ("IHO") pursuant to Section 1415(b)(2), Title 20, U.S.Code and R.C. 3323.05(E). In the interim, Fairland continued its home instruction program for Allan. Additionally, beginning in November 1990, the Cremeanses hired Theresa Aliff, a college student, to work as an aide for five hours per day to allow Judy Cremeans to do household chores while someone watched Allan.

Following a hearing, the IHO issued a decision on February 4, 1991, which determined that Fairland's IEP for 1990–1991 did not provide a free appropriate public education to Allan since it lacked a twenty-four-hour-a-day residential behavior management program. The IHO issued the following orders: (1) Fairland was to pay for Allan to be enrolled in a residential behavior management program offered by Autism Services Center ("ASC") in Huntington, West Virginia; (2) Allan would stay in the ASC program for at least nine months or until a new IEP was prepared for him; (3) Fairland would reimburse the Cremeanses for the cost of employing Aliff in their home; and (4) the Cremeanses were not entitled to an extended program beyond a regular school year.

Fairland and the Cremeanses appealed the IHO's decision to a state level review officer ("SLRO") who was appointed by the Ohio Department of Education. In April 1991, the SLRO issued a decision which partially affirmed and partially reversed the IHO's decision. The SLRO affirmed the IHO's determination that Fairland's 1990–1991 IEP for Allan was inappropriate due to the lack of any twenty-four-hour-a-day behavior management program. Nevertheless, the SLRO reversed the IHO's order concerning residential placement with ASC because she determined that the home instruction program, when coupled with a behavior management program, would provide an appropriate education. The SLRO affirmed the IHO's award reimbursing the Cremeanses for employing Aliff in their home and further affirmed the IHO's denial of the Cremeanses' request for an extended school year program.

The Cremeanses filed a notice of appeal and complaint in the common pleas court pursuant to Section 1415(e)(2), Title 20, U.S.Code and R.C. 3323.05(F). A copy of the notice of appeal and complaint was filed with the Ohio Department of Education on or about June 4, 1991.[1] Fairland filed a "NOTICE OF CROSS–APPEAL," which it claimed to be pursuant to R.C. 3323.05(F). A "PROOF OF FILING" attached to the notice stated that a copy was filed with the Ohio Department of Education on June 14, 1991.

The common pleas court subsequently held an evidentiary hearing that produced the following pertinent evidence. The hearing focused on events that had occurred following the SLRO's April 1991 decision. Fairland did not offer Allan an educational program for the summer of 1991. Through state and local aid, as well as their own money, the Cremeanses were able to obtain a program for him from ASC. The program started as a respite program that was designed to give Judy Cremeans a break from caring for Allan by taking him out of the house for eight hours every day for two weeks. The respite program did not work well because of the lack of time to implement a consistent program for Allan and due to Allan's inappropriate behavior, *i.e.*, running away from the group, throwing temper tantrums, and running off a twelve-foot-high embankment. At the conclusion of the respite program, ASC attempted to implement a program for Allan in which its counselors would work with Allan for eight hours per day, seven days a week in the Cremeanses' home. Charles Jarrell, a college student who is an ASC counselor, worked with Allan for five days per week during ASC's program. The ASC program lasted from August 1991 through February 1992.

According to Jarrell and Judy Cremeans, Allan experienced demonstrable gains in behavior, communicative skills, and other academic areas whenever Jarrell was present. Nevertheless, on evenings, weekends, and other occasions when Jarrell was not with Allan, Allan regressed to the point where his behavior was similar to his prior conduct. This was due in part to Allan's ability to physically overpower his mother and brother and the Cremeanses' inability to adopt a response of "planned ignorance" to Allan's self-abusive behavior. Jarrell noted that Allan's biggest problem was his inability to generalize what he learned from Jarrell, *i.e.*, to apply his lessons to different people or different environments. Cindy Dollman, formerly employed as a behavior specialist and speech therapist at ASC, testified that generalization is important in order to function successfully in society. Jarrell opined that in order for Allan to achieve reintegration into school, a twenty-four-hour-a-day residential program similar to that provided by ASC was necessary to overcome his generalizing problem. Dollman

---

1. Although the notice of appeal and complaint listed the Ohio Department of Education as a defendant along with Fairland, the department was subsequently dismissed as a party to the action.

agreed that Allan's long-term goals of effective communication, social integration, and independence could not be met without a twenty-four-hour-a-day residential program.

When the ASC program stopped in February 1992, due to an unwillingness of local agencies and/or Fairland to agree to pay a portion of the cost, Fairland contacted the Cremeanses and stated that an IEP would be prepared for Allan covering the balance of the 1991–1992 school year. The Cremeanses personally paid ASC to continue Jarrell's forty hours per week with Allan, although they could not afford to retain the weekend counselor. On February 3, 1992, Dollman issued a memorandum which concluded:

"Based on the trends toward improvement that have been demonstrated by this 'fragment' of a program, I feel very confident that Allan would greatly benefit from an intensive, highly structured 24 hour/day program. This program should be staffed 2:1 and be supervised by a professional staff that is well trained in behavior analysis and characteristics of the autistic learner. This program should include 7 hours/day, 5 days/wk of a classroom setting that will meet his educational and vocational needs and allow him to interact with his peers. The rest of his day should be intensely programmed in the areas of daily living skills, communication, leisure, and community participation.

"I would recommend a community group residence as a setting for this program. Mrs. Cremeans has been on-duty without a break 24 hours/day, 365 days a year since Allan became a part of their family. This situation greatly intensified when Allan was expelled from his school program.

"As we discovered, it is very difficult to implement a program such as this in an individual's family home.

" * * *

"A neutral and novel setting offers a much better atmosphere to implement new rules and to create behavioral change. I believe this setting would be the most beneficial for Allan at this time."

On March 2, 1992, the CCDD and ADDP representatives who had previously evaluated Allan in 1990 noted that they agreed with ASC that Allan "would greatly benefit from an intensive, highly structured 24 hour/day program."

Fairland failed to obtain a consultative report concerning behavioral programming for Allan until March 29, 1992, when Thomas Kimball, a behavior specialist, issued a report which called for a "highly structured behavior management program that would require a two to one staff to child ratio." Kimball concluded that his program "may initially be implemented within the home setting but should be gradually transferred to a more appropriate neutral setting." Kimball further stated that Jarrell should be included as an integral part of any behavior

management program due to his "strong rapport" with Allan. In April 1992, Fairland met with the Cremeanses to discuss its proposed IEP for Allan for the balance of the school year, which consisted of only twenty-six more days. Fairland's IEP consisted of one hour per day of home instruction and six hours per day of two aides' services, with one of the aides being Jarrell. The IEP also incorporated Kimball's behavior management plan. The Cremeanses rejected the IEP. Fairland's subsequently proposed IEP for the 1992–1993 school year contained provisions similar to those in the 1991–1992 IEP.

Barbara Riley, Allan's teacher at Fairland from 1983 through 1990, had assisted in preparing Allan's IEPs for 1990–1991, 1991–1992, and 1992–1993. Although she had not been personally involved with Allan's instruction since 1990, she believed that her 1992–1993 drafted IEP was "realistic" and that it would "work."

After receiving post-trial briefs, the common pleas court entered a "judgment" which determined that (1) Fairland's IEPs did not provide Allan with an appropriate education; (2) Allan Cremeans must be placed in a full-time residential program similar to that provided by ASC; (3) the Cremeanses were not entitled to damages for educational or related services paid for by them; and (4) the Cremeanses were not entitled to an additional two years of compensatory education for Allan. The common pleas court's entry also determined that the Cremeanses were entitled to attorney fees and noted that if counsel could not reach an agreement concerning the amount, the court would consider a motion concerning the attorney-fees issue. The Cremeanses subsequently filed an unopposed motion for $23,155.50 in attorney fees and a detailed affidavit and fee statement of their counsel. This motion was granted. The parties filed timely notices of appeal and cross-appeal.

Fairland's first assignment of error asserts that the lower court erred in failing to give due deference to the decision of the SLRO by ordering Fairland to provide the Cremeanses with an IEP consisting of a twenty-four-hour-a-day, seven-day-a-week, twelve-month residential program. In 1975, the United States Congress enacted Public Law 94–142, which was originally known as the "Education for All Handicapped Children Act of 1975," but was renamed in 1990 as the "Individuals with Disabilities Education Act" ("IDEA"). See Section 1400 et seq., Title 20, U.S.Code. The primary purpose of the Act is to assure that all children with disabilities between the ages of three and twenty-one have available to them a free appropriate public education which emphasizes special education and related services designed to meet their unique needs. Section 1400(c); Daniel & Coriell, Traversing the Sisyphean Trails of the Education for all Handicapped Children's Act: An Overview (1992), 18 Ohio N.U.L.Rev. 571, 574; Note, Burden of Proof Under the Education for All Handicapped Children Act (1990), 51 Ohio

St.L.J. 759, 760. IDEA conditions each state's receipt of federal funds on adoption, implementation, and compliance with special education procedures. Buchter, Scriven & Sheeran, Ohio School Law (1992) 451, T 28.01(A).

In 1976, the Ohio General Assembly revised R.C. Chapter 3323 in order to bring Ohio law into conformity with the new federal standards for special education to assure eligibility for federal financial assistance. 1 Baker & Carey, Ohio School Law (1992) 406, Section 9.09. In accordance with IDEA, the purpose of R.C. Chapter 3323 is to assure that all handicapped children three to twenty-one years of age in Ohio shall be provided with a free appropriate public education. R.C. 3323.02; see, also, *Austintown Loc. School Dist. Bd. of Edn. v. Mahoning Cty. Bd. of MRDD* (Nov. 27, 1991), Mahoning App. No. 90 C.A. 27, unreported, 1991 WL 256482.

This case was brought pursuant to both the federal and state provisions. We note that Section 1415, Title 20, U.S.Code dictates the procedures to be followed even if they conflict with the state's provisions. Buchter, Scriven & Sheeran, Ohio School Law (1992) 462, T 28.10(A). Initially, we must determine the proper standard of judicial review in appeals pursuant to IDEA. Any party aggrieved by the findings and decision of the state administrative proceedings may bring a civil action in any state court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. Section 1415(e)(2). The initial reviewing court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.*

In *Hendrick Hudson Dist. Bd. of Edn. v. Rowley* (1982), 458 U.S. 176, at 205–206, 102 S.Ct. 3034, at 3051, 73 L.Ed.2d 690, at 711–712, the United States Supreme Court emphasized that initial reviewing courts should make "independent decisions" based on a preponderance of the evidence but should also give "due weight" to the state administrative proceedings:

"Thus the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that Section 1415(e) requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings."

Courts have generally interpreted *Rowley* to require the state common pleas court or federal district court to review the administrative proceedings *de novo* while giving due deference to the administrative body. *Gillette v. Fairland Bd. of Edn.* (C.A.6, 1991), 932 F.2d 551, 553; *Roncker ex rel. Roncker v. Walter* (C.A.6, 1983), 700 F.2d 1058, 1062, certiorari denied (1983), 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171. While the court must recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such findings is ultimately left to the discretion of the trial court. *Hampton School Dist. v. Dobrowolski* (C.A.1, 1992), 976 F.2d 48, 52. Where states have two-tiered administrative review processes, as in Ohio, the court must afford due weight to the final state administrative decision, in this case that of the SLRO. *Thomas v. Cincinnati Bd. of Edn.* (C.A.6, 1990), 918 F.2d 618, 624; *Karl v. Genesco School Dist. Bd. of Edn.* (C.A.2, 1984), 736 F.2d 873, 877.

We now must determine the appropriate standard of review for appellate courts of judicial determinations in IDEA actions. Fairland cites *Thomas* in support of its contention that we must review the merits of its appeal *de novo*. However, as the Cremeanses note in their supplemental brief, *Thomas* states only that the "procedural posture of this case [*i.e.,* the district court's granting of summary judgment] requires [the appellate court] to review the district court's decision *de novo*." *Id.,* 918 F.2d at 624. This is the correct standard of review for summary judgments. *Midwest Specialties, Inc. v. Firestone Tire & Rubber Co.* (1988), 42 Ohio App.3d 6, 8, 536 N.E.2d 411, 413–414. In Guernsey, When the Teachers and Parents Can't Agree, Who Really Decides? Burdens of Proof and Standards of Review Under the Education for All Handicapped Children Act (1988), 36 Cleve.St.L.Rev. 67, 89–90, the author concluded that a determination of whether a proposed IEP provides a free and appropriate education is a factual determination that should be reviewed under the "clearly erroneous" standard by appellate courts:

"Traditional analysis would lead one to conclude that appellate court review of the lower court's determination would be controlled by the law-fact distinction. Trial court factual determinations are reviewable only under a clearly erroneous standard whereas decisions of law are decided *de novo*.

"Under traditional analysis, questions such as whether the Act requires provision of related services, whether prior to amendment the Act contemplated an award of attorneys' fees, and who under the Act has the burden of proof are reviewed *de novo* by the appellate court.

"Factual questions should, however, remain subject to the clearly erroneous standard of review required under Federal Rule of Civil Procedure 52.

" * * *

"In the context of the Act, most courts have held that the basic issue of whether the LEA's proposal will provide a free and appropriate education is a factual determination." (Footnotes omitted.)

Nevertheless, it appears that a growing number of courts have noted that the trial court's determination of whether an IEP is appropriate is a "mixed question of law and fact." *Hampton School Dist., supra,* 976 F.2d at 52. The Fifth, Sixth, Seventh, and Ninth Circuit Courts of Appeals subject the review of a trial court's conclusion on the appropriateness of an IEP to *de novo* review (*i.e.,* mixed question of law and fact), but subject the underlying findings of fact by the trial court to the more limited clearly erroneous standard. *Christopher M. v. Corpus Christi Indep. School Dist.* (C.A.5, 1991), 933 F.2d 1285; *Cordrey v. Euckert* (C.A.6, 1990), 917 F.2d 1460, 1466, citing *Doe v. Defendant I* (C.A.6, 1990), 898 F.2d 1186, 1190; *Lachman v. Illinois State Bd. of Edn.* (C.A.7, 1988), 852 F.2d 290, 293, certiorari denied (1988), 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327; *Gregory K. v. Longview School Dist.* (C.A.9, 1987), 811 F.2d 1307, 1310.

This is somewhat similar to this court's review of suppression rulings. See, *e.g., State v. Dreher* (July 28, 1992), Highland App. No. 786, unreported, at 5, 1992 WL 188501; *State v. Fausnaugh* (Apr. 30, 1992), Ross App. No. 1778, unreported, at 3, 1992 WL 91647. In other words, we must accept the common pleas court's findings of fact if they are not clearly erroneous, *i.e.,* based upon some competent credible evidence. Accepting those facts as true, we must independently and without deference to the trial court's conclusion determine as a matter of law, *i.e., de novo,* whether the proposed IEPs were legally appropriate. We are persuaded that the foregoing hybrid standard of appellate review is proper, and with this standard of review in mind, we now address the merits of Fairland's first assignment of error.

Fairland asserts that its proposed IEPs for the 1990–1991, balance of 1991–1992, and 1992–1993 school years were appropriate and that the common pleas court erred in holding otherwise. Fairland contends that the common pleas court failed to accord due weight to the decision of the SLRO. The purpose of the procedures in IDEA, R.C. Chapter 3323, and accompanying regulations is to ensure that handicapped children receive a "free appropriate public education" within the meaning of state and federal law. 1 Baker & Carey, Ohio School Law (1992) 407, Section 9.10; Section 1401(a)(18), Title 20, U.S.Code; R.C. 3323.01(D). The United States Supreme Court has held that a state has satisfied its obligation to provide a "free appropriate public education" when it has provided "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction," with the instruction comporting with the child's IEP. *Rowley, supra,* 458 U.S. at 203, 102 S.Ct. at 3049, 73 L.Ed. at

710–11; *Christopher M., supra,* 933 F.2d at 1289; 1 Baker & Carey, Ohio School Law (1992) 407, Section 9.10.

■ The IEP is the primary vehicle through which handicapped children are guaranteed a "free appropriate public education." *Honig v. Doe* (1988), 484 U.S. 305, 311, 108 S.Ct. 592, 597–598, 98 L.Ed.2d 686, 699; *Thomas, supra,* 918 F.2d at 620. "IEP" is defined as a written statement for each handicapped child designed to meet the child's unique needs, which shall include (1) a statement of the present levels of educational performance of the child; (2) a statement of annual goals, including short-term instructional objectives; (3) a statement of the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) a statement of the transition services needed for the child; (5) the projected date for initiation and anticipated duration of the services; and (6) appropriate criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved, and whether current placement is appropriate. See, generally, Section 1401(a)(20), Title 20, U.S.Code; R.C. 3323.01(E).

■ The trial court's assessment of the IEP must address both procedural guarantees and substantive goals by making the following determinations:

"[A] court's inquiry in suits brought under [Section] 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." (Footnotes omitted.) *Rowley, supra,* 458 U.S. at 206–207, 102 S.Ct. at 3051, 73 L.Ed.2d at 711–713.

■ Here, there is no assertion that Fairland failed to comply with the procedural requirements of either federal or state law. Consequently, the issue before the trial court was whether the proposed IEPs were reasonably calculated to enable Allan to receive educational benefits. The ultimate question for a court under the Act is whether a proposed IEP is adequate and appropriate for a particular child at a given point in time. *Roland M. v. Concord School Comm.* (C.A.1, 1990), 910 F.2d 983, 990. In undertaking such inquiry, it should be emphasized that although school districts and states are not required to maximize the potential of disabled children commensurate with opportunity afforded other children, they must provide more than a trivial educational benefit in order to satisfy the reasonable requirement. Buchter, Scriven & Sheeran, Ohio School Law (1992) 453–454, ¶ 28.02; *Rowley, supra,* 458 U.S. at 199–200, 102 S.Ct. at

3047–3048, 73 L.Ed. at 708;  *Polk v. Cent. Susquehanna Intermediate Unit 16* (C.A.3, 1988), 853 F.2d 171;  *Carter v. Florence Cty. School Dist. Four* (C.A.4, 1991), 950 F.2d 156.

■ In initially reviewing the IEPs for the balance of the 1991–1992 and the entire 1992–1993 school years, we note that both IEPs offered home instruction featuring one teacher and two aides, as well as a behavior management program. The common pleas court determined that the IEPs were inappropriate, *i.e.*, not reasonably calculated to enable Allan to receive educational benefits.  The court based the foregoing legal conclusion upon its underlying factual determination that "99.4% of any gains made in any particular day are lost overnight, that any gains in a particular week are drastically set back or lost over a weekend and the same is true for periods in which Charles Jarrell is not present."

The common pleas court's factual determination was supported by the testimony of Jarrell and Judy Cremeans that on occasions when Jarrell was not with Allan, Allan regressed to the point where his behavior was similar to what it was prior to the ASC program of home instruction.  The common pleas court made the further legal conclusion that the only appropriate IEP for Allan would be a twenty-four-hour-a-day residential program similar to that offered by ASC.  This was supported by Jarrell and Dollman's testimony that Allan's educational goals could not be achieved without a twenty-four-hour-a-day residential program. CCDD and ADDP representatives appeared to concur with Dollman's recommendations in a March 2, 1992 letter.  Even Thomas Kimball, Fairland's behavior specialist who concluded that a behavior management program "may initially be implemented within the home setting," further stated that it "should" eventually be transferred to a "more appropriate neutral setting."

As noted in 1 Baker & Carey, Ohio School Law, *supra*, at 407, Section 9.10:

"In some cases, the needs of individual children may require a program which goes beyond the confines of the school setting or the regular school year.  Thus, a child with severe behavior problems which have proven difficult to control in a normal school setting must be given serious consideration for a 24–hour residential placement.  Likewise, an "extended school year" program must be provided to a handicapped child where necessary to prevent significant regression of skills or knowledge acquired during the regular school year."  (Footnotes omitted.) See, also, *Cordrey, supra*, 917 F.2d at 1470–1474;  *Hall v. Vance Cty. Bd. of Edn.* (C.A.4, 1985), 774 F.2d 629;  *Ash v. Lake Oswego School Dist. No. 75* (D.Ore. 1991), 766 F.Supp. 852, 862.

The common pleas court's factual determination that Allan experienced significant regression due to his inability to generalize in the absence of Jarrell was fully supported by the evidence introduced at the hearing it held and, thus, was

(being based upon some competent evidence) not clearly erroneous. Accepting the common pleas court's apparent factual determinations as true, we are persuaded that its legal conclusions that (1) the IEPs for 1991–1992 and 1992–1993 were inappropriate, and (2) an appropriate IEP for Allan must include a twenty-four-hour-a-day residential program similar to the one offered by ASC were proper.

In so holding, we reject Fairland's contention that the common pleas court failed to give due weight to the SLRO's conclusion that neither an extended school year nor a residential placement was required. Indeed, "[g]iven the clear authority to hear additional evidence and decide the case by a preponderance of the evidence, due weight should be limited to purely educational policy decisions and to factual questions where the agency has brought to the proceedings an expertise or advantage not available to the trial court." Guernsey, *supra*, 36 Cleve.St.L.Rev. at 88. Pursuant to Section 1415(e)(2) and R.C. 119.12 (which is specifically referred to in R.C. 3323.05[F] ), the common pleas court possessed statutory authority to allow additional evidence which was not contained in the administrative record. The additional evidence properly concerned relevant events that occurred subsequent to the administrative proceeding. *Metro. Government of Nashville & Davidson Cty. v. Cook* (C.A.6, 1990), 915 F.2d 232, 234. Insofar as the common pleas court's determination of the appropriateness of the 1991–1992 and 1992–1993 IEPs was concerned, it based its decision on evidence which was not before either the IHO or SLRO; hence, the SLRO's decision was not entitled to much weight under these circumstances.

The 1990–1991 IEP, which the SLRO determined to be inappropriate due to the absence of a behavior management program, was also found to be inappropriate by the common pleas court. Fairland contends that the 1990–1991 IEP was reasonably calculated to provide educational benefit to Allan. However, as noted by the SLRO in her decision, the behavior management program recommended by CCDD was considered essential to allow Allan to benefit educationally from the school's instruction. Hence, the common pleas court's conclusion that the 1990–1991 IEP was also inappropriate was supported, in part, by the SLRO's decision and the administrative proceedings. Based upon the foregoing, the common pleas court did not err in either concluding that the proposed IEPs were inappropriate or that a twenty-four-hour-a-day, extended school year, residential placement was required in order for Allan to. achieve more than *de minimis* educational benefit. Fairland's first assignment of error is overruled.

Fairland's second assignment of error asserts that the common pleas court erred in failing to consider or give weight to evidence regarding the

extraordinary cost of the program it ordered Fairland to provide to the Cremeanses. Jerry McConnell, Superintendent of the Fairland Local School District, testified that the district's budget for the 1991–1992 school year was $572,000 for the education of handicapped students, of which $122,000 was from local revenues. For 1991–1992, the district had two hundred and eight handicapped students. Based on the district's budget, McConnell stated that Fairland could not afford to place Allan at an ASC-style program for the 1992–1993 school year. Based upon a proposed budget, the annual cost of the ASC program for Allan would be approximately $94,000. The common pleas court's August 6, 1992 entry did not expressly discuss cost as a factor in its determination of the appropriateness of Fairland's proposed IEPs.

When devising an appropriate program for individual students, cost concerns are legitimate. *Roncker v. Walter* (C.A.6, 1983), 700 F.2d 1058, 1063, certiorari denied (1983), 478 U.S. 1005, 104 S.Ct. 196, 78 L.Ed.2d 171. Cost is a proper factor to consider because excessive spending on one handicapped child deprives other handicapped children. *Id.; Age v. Bullitt Cty. Schools* (C.A.6, 1982), 673 F.2d 141, 145. Nevertheless, cost considerations are only relevant when choosing between several options, all of which offer an *appropriate* education; therefore, where the only placement that afforded a free *appropriate* public education was highly expensive, the school district cannot rely on cost in support of an alternative placement. *Clevenger v. Oak Ridge School Bd.* (C.A.6, 1984), 744 F.2d 514, 517; Buchter, Scriven & Sheeran, Ohio School Law (1992) 455, T 28.02. Since the evidence introduced at the common pleas court hearing supported that court's conclusion that Fairland's IEPs were inappropriate and that only an ASC-like program would provide a free appropriate public education to Allan, it did not err in failing to expressly consider costs in its judgment. Fairland's second assignment of error is overruled.[2]

We now consider the assignments of error raised by the Cremeanses' cross-appeal. Their first assignment of error asserts that the common pleas court erred by denying them reimbursement for the services of various aides, including Theresa Aliff as well as the services of Jarrell, the ASC counselor, after local cluster funding expired in February 1992. These expenses were approximately $12,000. The Cremeans requested reimbursement for these expenses during the proceedings below, but the common pleas court stated in its August 6, 1992 entry that it would "not allow damages for the employment of Theresa Aliff or for the various and sundry costs of educational services paid by the Cremeans." The

---

2. Since Fairland's assertion that the Cremeanses' attorney fee award was erroneous was premised solely on its contentions that its IEPs were appropriate, the common pleas court's judgment concerning attorney fees is also affirmed.

court did not specify any rationale for the foregoing ruling, and the Cremeans did not request findings of fact and conclusions of law.

Section 1415(e)(2), Title 20, U.S.Code authorizes "such relief as the court determines is appropriate" in IDEA cases. The foregoing language indicates a degree of discretion on the part of the lower court in fashioning a remedy for a school district's failure to comply with the Act. *Burlington School Comm. v. Massachusetts Dept. of Edn.* (1985), 471 U.S. 359, 369, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385, 394–395. Therefore, the lower court's decision as to whether or not to grant a particular remedy should not be reversed absent an abuse of discretion. See *Lester H. v. Gilhool* (C.A.3, 1990), 916 F.2d 865, 872–873. An abuse of discretion involves more than an error of law or of judgment; it connotes an attitude on the part of the court that is unreasonable, unconscionable or arbitrary. *Franklin Cty. Sheriff's Dept. v. State Emp. Relations Bd.* (1992), 63 Ohio St.3d 498, 506, 589 N.E.2d 24, 30–31; *Wilmington Steel Products, Inc. v. Cleveland Elec. Illum. Co.* (1991), 60 Ohio St.3d 120, 122, 573 N.E.2d 622, 624–625. In making its determination of the appropriate remedy, equitable considerations are relevant. *Burlington, supra,* 471 U.S. at 374, 105 S.Ct. at 2004–2005, 85 L.Ed.2d at 397–398; *Murphy v. Timberlane Regional School Dist.* (C.A.1, 1992), 973 F.2d 13, 16; *Burr v. Ambach* (C.A.2, 1988), 863 F.2d 1071, 1078.

In *Burlington,* the United States Supreme Court held that parents of a disabled child are entitled to reimbursement for expenditures made to unilaterally place their child in a private educational facility where the private placement was appropriate and the school district's proposed IEP was inappropriate. See, also, 3 Rapp, Education Law (1990) 10–120, Section 10.03[2][f][ii]; *Matta v. Indian Hill Exempted Village School Dist. Bd. of Edn.* (S.D.Ohio 1990), 731 F.Supp. 253, 258. In this case, the Cremeanses did not place Allan in a private educational facility, but instead kept him at home and personally expended money on aides such as Aliff and ASC counselors like Jarrell. However, as the Cremeanses readily admit, these expenditures did not furnish Allan an "appropriate education" as defined under either the federal or state statutes. Indeed, Judy Cremeans testified that despite these expenditures, when Jarrell was not around, Allan's behavior was similar to that before Jarrell began working with him. The trial court further found that "99.4%" of all gains made in the home instruction program paid for in part by the Cremeanses were "set back" or "lost" when Jarrell was not present. Therefore, since the payments made by the Cremeanses, like the proposed IEPs, failed to afford Allan an appropriate

education, the common pleas court did not abuse its discretion in denying their claim for reimbursement insofar as it related to *Jarrell's services.*[3]

Nevertheless, the Cremeanses further argue that the common pleas court erred in not affirming the SLRO's award reimbursing them for *employing Aliff* in their home, since Fairland failed to either timely appeal the SLRO's decision pursuant to R.C. 3323.05(F) or file either a complaint or counterclaim pursuant to Section 1415(e)(2). R.C. 3323.05(F) provides for aggrieved parties to file an appeal within forty-five days of notification of the order to the common pleas court. Although the Cremeanses filed a timely appeal, Fairland's "NOTICE OF CROSS–APPEAL" was not filed within the forty-five-day period. Moreover, App.R. 4(A), which allows for cross-appeals within ten days of the filing of a notice of appeal, does not apply to an appeal from the SLRO to the common pleas court. See App.R. 1, which states that the rules of appellate procedure govern procedure in "appeals to courts of appeals from the trial courts of record in Ohio." Furthermore, Fairland filed neither a complaint nor a counterclaim pursuant to Section 1415(e)(2) and the Cremeanses did not consent to a trial of the SLRO's reimbursement decision. Under these circumstances, the common pleas court erred in not affirming the SLRO's reimbursement decision where Fairland had neither timely appealed the administrative order nor filed either a complaint or counterclaim pursuant to IDEA. The Cremeanses' first assignment of error is sustained in part and overruled in part.

The Cremeanses' second assignment of error asserts that the common pleas court erred in denying their request for compensatory education. Like the retroactive reimbursement in *Burlington,* imposing liability for compensatory educational services on a school district that failed to provide a free appropriate education merely requires it to belatedly pay expenses that it should have paid all along. *Hall v. Knott Cty. Bd. of Edn.* (C.A.6, 1991), 941 F.2d 402, 407; *Miener v. Missouri* (C.A.8, 1986), 800 F.2d 749, 753; see, generally, Buchter, Scriven & Sheeran, Ohio School Law (1992) 446–467, T 28.12. As in *Burlington,* recovery is necessary to secure the child's right to a free appropriate public education, since it is manifest that Congress did not intend the child's entitlement to a *free* education to turn upon the child's parent's ability to "front" its costs. *Hall, supra,* 941 F.2d at 407, citing *Miener.* A child should not be wholly deprived of education because his parents could not afford to pay for an appropriate education at a private school while waiting for the state or local agency to litigate the issue of a proper placement. 5 Rapp, Education Law (1990)

---

**3.** This is not to suggest that partial reimbursement can never be awarded pursuant to IDEA or R.C. Chapter 3323. See, *e.g., Lascari v. Bd. of Edn. of Ramapo Indian Hills Regional High School Dist.* (N.J.1989), 116 N.J. 30, 560 A.2d 1180.

10–126.9, Section 10.03[2][f][iv]; *Burr, supra,* 863 F.2d at 1078. Both remedies of reimbursement and compensatory education are necessary to preserve a handicapped child's right to a free education. *Gilhool, supra,* 916 F.2d at 873; *Jefferson Cty. Bd. of Edn. v. Breen* (C.A.11, 1988), 853 F.2d 853, 857–858.[4] The Supreme Court of Ohio has expressly recognized the availability of the remedy of compensatory education in actions brought pursuant to IDEA and R.C. Chapter 3323. *Strongsville City School Dist. Bd. of Edn. v. Theado* (1991), 57 Ohio St.3d 162, 163, 566 N.E.2d 667, 668, citing *Gilhool, supra,* with approval.

The only reason given by the common pleas court in its denial of the Cremeanses' request for compensatory education is that Fairland's "position was taken in good faith." Although equitable considerations are relevant in shaping the particular remedy in IDEA actions, *Burlington, supra; Mrs. C. v. Wheaton* (C.A.2, 1990), 916 F.2d 69, 75, as the Cremeanses note, no court addressing the issue of compensatory education has precluded this remedy solely because of the "good faith" of a school district which nonetheless failed in its statutorily mandated duty to provide a handicapped child with a free appropriate public education. Since the review process can be lengthy, this rationale would afford parents like the Cremeanses who are eventually determined to be correct in their desire for an appropriate placement a pyrrhic victory because if compensatory education is not allowed, Allan's right to a free appropriate public education between the ages of three and twenty-one years of age would be illusory. *Burr, supra,* 863 F.2d at 1078.

Additionally, Fairland on appeal claims that compensatory education is not warranted because Fairland's proposed IEPs were appropriate. However, as previously noted in our disposition of Fairland's appeal, they were not appropriate. Pursuant to the litany of case authorities as well as the legislative intent in enacting IDEA and R.C. Chapter 3323, we are persuaded that the common pleas court abused its discretion in failing to award compensatory education for Allan. On remand, the court should determine the amount of compensatory education to which Allan is entitled, noting that for at least one-half of the 1991–1992 school year, the Cremeans apparently advised Fairland that preparation of an IEP was unnecessary for the portion of the year that ASC attempted a home instruction program.[5] The Cremeanses' second assignment of error is sustained.

---

4. We note that both remedies should not be awarded where doing so would result in a "double recovery," *i.e.,* where during a one-year period when the school's proposed placement was inappropriate and a private placement was appropriate, the parents unilaterally placed the child in a private facility at their own expense. In such case, reimbursement for the one year of private placement would be sufficient, since an additional award of one year of compensatory education would go beyond mere reimbursement, where the parents' placement provided the requisite appropriate education.

5. This could conceivably limit the amount of compensatory education by a half year.

Accordingly, for the foregoing reasons, the judgment of the common pleas court is reversed on its failure to affirm the award of the SLRO concerning reimbursing the Cremeanses for employing Aliff in their home and reversed and remanded on its failure to award the Cremeanses compensatory education for the years that Allan was denied a free appropriate public education. The remainder of the court's judgment, including ordering a full-time residential program for Allan and attorney fees to the Cremeanses, is affirmed.

*Judgment affirmed in part*
*and reversed in part.*

GREY and PETER B. ABELE, JJ., concur.